# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 14, 2014 Session

## STATE OF TENNESSEE v. PHTRA OUM

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 41100921     Michael R. Jones, Judge**

**No. M2013-01039-CCA-R3-CD - Filed May 12, 2014**

Defendant, Phtra Oum, was indicted by the Montgomery County grand jury for first degree premeditated murder, attempted second degree murder, and possession of a firearm during the commission of a dangerous felony.  Following a jury trial, Defendant was convicted of first degree premeditated murder and possession of a firearm with intent to go armed during an attempt to commit second degree murder.  The trial court set aside the firearm conviction and sentenced Defendant to life imprisonment for his first degree murder conviction.  Defendant appeals his conviction, asserting that the evidence was insufficient to sustain a conviction for first degree murder.  We conclude that the evidence was sufficient to sustain Defendant's conviction and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROBERT W. WEDEMEYER, J., joined.

Roger E. Nell, District Public Defender; and Crystal L. Myers, Assistant District Public Defender, Clarksville, Tennessee, for the appellant, Petra Oum.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Robert Nash, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

*Facts*

The victim in this case was Victor Moulden.  The victim's sister, Melyssa Moulden, testified that on June 18, 2011, the victim's birthday, she and the victim and two friends went

to a party at the University Landings Apartments. As they were walking to their car to leave, Defendant approached them in a "[v]ery aggressive, very harsh" manner, saying "'I am from California, Asian Cryps Gang, which y'all claiming?" Defendant was carrying a black handgun. Ms. Moulden testified that Defendant "put the gun up" for about twenty seconds, then Defendant pulled the gun out again and shot the victim twice. Ms. Moulden ran across the street. She saw Mr. Blue and Defendant struggling, and heard another gunshot. She saw Defendant "take off," and Mr. Moulden was lying on the ground. Ms. Moulden put her hand on Defendant's neck and screamed for help. She testified that no physical altercation occurred between Defendant and her brother preceding the shooting. The victim was turning to walk away when Defendant shot him.

Darrick Dillard testified that Victor and Melyssa Moulden and Mitchell Blue came to his apartment sometime between 10:20 and 10:45 p.m. They left the apartment at 1:30 or 1:45 a.m. Mr. Dillard was walking with the other three to their car when Defendant approached them. Defendant asked them if they were "crypping" and "he was talking about being Cali and ABZ gang," and Defendant had "a negative vibe." Mr. Dillard told Defendant that he was "not crypping or whatever." Defendant pulled out a gun and shook it, saying "'I'm from Cali. . . what's up, you crypping? You banging?'" Mr. Dillard walked away from Defendant across the street to where Melyssa was standing. He heard Melyssa say that Defendant had a gun, then he heard "shots and hollering." Mr. Dillard did not see the shooting. When he heard shots, he turned around and saw Defendant running away. Mr. Dillard testified that neither Mr. Moulden nor Mr. Blue was carrying a weapon. He testified that there was no physical altercation between the men before the shooting.

Mitchell Blue testified that he and Mr. Moulden were standing in the parking lot when he saw a car drive by, and Defendant was in the backseat, "hanging out of [the window]." Defendant asked them, "'what y'all claiming? Is y'all crypping?'" Defendant got out of the vehicle and approached Mr. Blue and Mr. Moulden. Mr. Moulden told Defendant, "'no, I don't do that, but I know people that do[.]'" Mr. Blue testified that he was a "Cryp," and Mr. Moulden was referring to him. Mr. Blue stepped in front of Mr. Moulden and shook Defendant's hand. Mr. Blue testified that Defendant "calmed down" and "wasn't as aggressive towards [him] anymore and it was kind of like okay." Defendant then turned toward Mr. Moulden. Defendant pulled out a gun and "waved it across [Mr. Moulden]'s face and put it back and that was it." Mr. Blue nodded to Mr. Moulden, "giving him a signal like let's go." Defendant then raised his hand and shot Mr. Moulden. Mr. Blue testified that Mr. Moulden was not being aggressive or confrontational to Defendant when Defendant shot Mr. Moulden. When Mr. Moulden was shot, he was looking toward Melyssa and Mr. Dillard. After Defendant shot Mr. Moulden, Mr. Blue "rushed him to reach for the gun." Defendant then turned and fired the gun at Mr. Blue. Mr. Blue was shot in the stomach. Mr. Blue grabbed the gun from Defendant and tried to shoot Defendant, but the gun was jammed.

Defendant ran away from the scene. Mr. Blue testified that "[d]rugs were never mentioned" during the verbal exchange with Defendant and that neither he nor Mr. Moulden were carrying any weapons.

Ronald Parrish, who worked as a bouncer at the Peay Patch nightclub on the date of the incident, testified that he patted down Defendant when Defendant attempted to enter the nightclub at 12:30 a.m. Mr. Parrish found a clip of 9 millimeter bullets in Defendant's pocket. Mr. Parrish took the clip and bullets and told Defendant that he could not enter the club with them. Defendant then "grabbed it from [him] and he took off." Mr. Parrish testified that Defendant was "coherent" and did not appear to be intoxicated. Mr. Parrish testified that the Peay Patch is located about 200 yards from the University Landing Apartments. Mr. Parrish testified that he did not find a gun on Defendant but that he did not finish searching Defendant before Defendant ran. Shawn Farr, the head of security at the Peay Patch on the date of the incident, checked Defendant's identification. He testified that Defendant "was kind of trying to wiggle out of getting patted down, he was like[, ']you know me, I've been here before.[']" Mr. Farr testified that "you could tell [Defendant] had a drink[,]" but that Defendant did not appear to be intoxicated and that "he was coherent" and "his speech wasn't slurred or anything."

Jenna Perry, a bartender at the Tap Room, which is located near the Peay Patch, testified that she spoke to Defendant for about 15 minutes after she stopped working at 1:45 a.m. Defendant was sitting at the bar, and she saw Defendant drink "two shots" and a beer. She testified that Defendant was friendly and not disruptive, and she did not observe any signs of Defendant being intoxicated. Another bartender at the Tap Room, Tiffany Roberts, testified that she saw Defendant drink a bottle of beer and two or three shots of liquor. She testified that Defendant left the bar around 1:45 or 2:00 a.m. and that he was at the bar for 45 minutes to an hour. She testified that Defendant did not appear to be intoxicated.

Ryan White was a resident at the University Landing Apartments at the time of the incident, and he testified that he saw the shooting from his apartment window. He saw a man standing in the street talking to two other men, and then he saw the man pull out a gun and fire three shots at the other men. He only saw the back of the shooter's head. The two men fell to the ground. Mr. White testified that Mr. Moulden was shot first in the neck. He saw the shooter throw something on the ground and run towards a gate, but he could not get out through the gate, and he ran another way where Mr. White could not see him anymore.

Officer Mohammed Dennis, of the Clarksville Police Department, responded to the Peay Patch for "a gun call." He was standing in the parking lot of the Peay Patch when he heard "three or four loud bangs and saw flashes." Officer Dennis saw Defendant running away from the victims, and he chased Defendant across the street to the apartments.

Defendant tried to enter the apartments through two doors, but the doors were locked. Sergeant Timothy Saunders arrived and ordered Defendant to the ground. They took Defendant into custody. Defendant had blood on his chin.

Sergeant Saunders was in a parking lot across the street from the Peay Patch, and he also heard the gunshots. He saw Officer Dennis chasing Defendant and yelling at Defendant to stop running. Sergeant Saunders testified that after they took Defendant into custody, he observed that Defendant "had an odor of alcohol about his person, but he wasn't intoxicated." Sergeant Saunders asked Defendant why he did not stop running, and Defendant responded that he had been drinking, heard shooting, and that he was a soldier and did not want to get in trouble.

Officer Zack Upton arrived at the scene to transport Defendant after Defendant was taken into custody. Officer Upton searched Defendant and found a 9 millimeter magazine. When Officer Upton removed the magazine from Defendant's pocket, Defendant said, "'that's not mine. I don't know where it came from.'" Officer Upton also observed blood spatter on Defendant's shorts. Officer Tyvis Woody removed Defendant's clothes from Defendant at the Special Operations Unit. He testified that he smelled alcohol on Defendant's breath but that Defendant seemed coherent.

Officers recovered three spent shell casings and a 9 millimeter handgun from the scene of the shooting. The gun contained a magazine with six unspent rounds, and one round was jammed in the chamber. Officers also found marijuana in the area from which Defendant had run.

Detective Tim Anderson was the lead investigator for the incident. He interviewed Defendant. Defendant was handcuffed and shackled to a pipe near the floor in the interview room. Detective Anderson took a swab sample of the blood stains on Defendant's face. About 20 to 30 minutes later, Detective Anderson went back into the interview room, and Defendant was lying in the floor. Detective Anderson tried to wake Defendant, and he smelled alcohol on Defendant. Detective Anderson testified, "[T]here was some level of intoxication, and I tried to make a determination as to how intoxicated he was? [sic] Whether or not he could understand his rights and so forth." Detective Anderson asked Defendant several questions, and Defendant responded appropriately. Defendant appeared "sleepy," but his responses were immediate, he was coherent, and his speech was not slurred. Detective Anderson advised Defendant of his rights, and Defendant requested an attorney.

Dr. John Davis, a medical examiner, performed an autopsy on the victim. He testified that the victim died from gunshot wounds to the neck and chest. The manner of death was homicide. Dr. Davis testified that soot around the victim's wounds indicated that the shot

was fired from a distance of three inches or less. Dr. Davis recovered projectile fragments from the victim's body. Dr. Davis testified that Defendant's blood alcohol level was .207.

Defendant was 22 years old at the time of trial. He testified that he was born and raised in California and that he had been a member of the "Asian Boys" gang since he was 15 years old. Defendant joined the Army and was stationed in Ft. Campbell at the time of the offense. He returned from a deployment in February 2011, and had been using drugs and alcohol to cope with the transition. On the night of the incident, he began drinking at about 8:00 p.m. He went to a bar where he continued to drink, and then he went to the Peay Patch. Defendant remembered taking the magazine with him, but he did not remember taking a gun. He testified that he "normally load[ed] the magazine up" and carried it with him. He testified that he remembered being patted down at the Peay Patch but that he walked away and did not run. When he left the Peay Patch, he went to the Tap Room and "had quite a few drinks" there.

Defendant and a friend left the Tap Room with the intentions of buying drugs. They drove into the parking lot of some apartments, and he saw "a dude with a bandana" and he approached him. He asked Mr. Moulden and Mr. Blue if they knew where he could get "some soft," meaning cocaine, and he asked if they "were crypping" to find out if they were in "an ally gang." Defendant began to feel threatened when Mr. Dillard walked over. Defendant testified, "that's when I was like you don't need all these people for a drug deal, you know? So I started getting on my toes, so to say." Defendant pulled out his gun to let them know he had a weapon. Mr. Dillard walked away, and Defendant put the gun back in his waist. Defendant testified that Mr. Blue stepped back and told Mr. Moulden, "'let's go.'" Mr. Blue then walked behind Defendant and "kept getting closer" to him. Defendant testified that Mr. Blue "made a sudden movement" and Defendant "got scared" and fired the gun. Defendant testified that he did not aim the gun, but that he "was just reacting." Mr. Blue then grabbed the gun, and they were "wrestling for the gun and the gun went off." Defendant dropped the gun, and then he "panicked" and ran away. Defendant recalled being drunk at the police station and "being on the floor trying to throw up." Defendant testified that he had no intention of killing anyone that night. He testified that "it was all more reflex[.]" On cross-examination, Defendant admitted that he did not see any weapons on Mr. Blue or Mr. Moulden and that neither man threatened him.

*Analysis*

Defendant contends that the evidence was insufficient to establish that he acted with premeditation when he shot and killed the victim. In Tennessee, great weight is given to the result reached by the jury in a criminal trial. A jury's verdict of guilty "accredits the testimony of the witnesses for the State, resolves all conflicts in favor of the theory of the

State, and removes the presumption of innocence." *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994). Such a verdict not only removes the presumption of innocence but affirmatively "raises a presumption of guilt" which a defendant must overcome by "showing that the evidence preponderates against the verdict in favor of his innocence." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).

Where sufficiency of the evidence is challenged, the relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based upon direct or circumstantial evidence. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). We may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

First degree murder is defined as the intentional and premeditated killing of another. Tenn. Code Ann. § 39-13-202(a)(1). The defendant did not dispute that he was responsible for the victim's death at trial and does not do so on appeal. Rather, he challenges only the issue of premeditation. Premeditation is defined as "an act done after the exercise of reflection and judgment" and committed after the accused "was sufficiently free from excitement and passion as to be capable of premeditation." Tenn. Code Ann. § 39-13-202(d). However, "[i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id*. Intent is a question of fact for the jury to determine, and it may be proven by circumstantial evidence, including evidence of: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Additional factors indicative of the existence of

premeditation include a lack of provocation on the part of the victim and the defendant's failure to render aid to a victim. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). This list is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d); *see State v. Pike*, 978 S.W.2d 904, 914-15 (Tenn. 1998).

Our review of the record supports the premeditation found by the jury. In the light most favorable to the State, the evidence showed that Defendant exited the vehicle in which he was a passenger and approached Mr. Blue and Mr. Moulden as they were walking with Mr. Dillard and Ms. Moulden across the parking lot of the apartments. Defendant asked the group if they were members of a gang. Defendant was acting "very aggressive" towards the group. Mr. Blue indicated that he was a member of the same gang as Defendant, and Mr. Moulden replied that he was not in a gang. Defendant then turned his attention to Mr. Moulden and pulled out a gun and waved it in front of him. Defendant then put the gun back into his pocket. Mr. Blue testified that he was trying to diffuse the situation, and Mr. Blue and Mr. Moulden both turned to walk away from Defendant. Defendant then pulled out his gun again and shot Mr. Moulden twice within close range in the neck and chest.

Several witnesses, including police officers in the area at the time of the shooting, observed Defendant run from the scene. Once apprehended, Defendant denied shooting anyone and denied that the gun found at the scene belonged to him. Defendant attempted to remove the victim's blood spatter from his face. The gun carried by Defendant and used to kill the victim had seven rounds still in it after the shooting, and Defendant was carrying a magazine with more rounds. None of the witnesses to the shooting saw any physical altercation between Defendant and the victim preceding the shooting. Defendant admitted that nobody threatened him and that he never saw anyone in the group with a weapon. Although Defendant testified that he did not remember carrying a gun with him, the evidence showed that he attempted to enter a nightclub prior to the shooting and avoid a routine pat-down. When a nightclub employee found the magazine clip during a pat-down, Defendant fled, which supports a reasonable inference that Defendant tried to conceal the weapon.

Defendant argues that the State failed to prove that Defendant had time to exercise reflection and judgment which formed premeditation. We disagree. The jury could reasonably infer that the first time Defendant pulled out his gun and waved it in the victim's face, he may not have yet had time to exercise reflection and judgment. However, the jury could also reasonably find that upon putting away the weapon and prior to pulling it out again to shoot the victim in the neck and chest from no more than three inches away, Defendant had sufficient time to exercise reflection and judgment in order to form premeditation to kill the victim.

Defendant also asserts that intoxication prevented him from forming the requisite intent; however, the evidence establishes otherwise. Several witnesses testified that Defendant did not appear to be overly intoxicated. While those witnesses testified that Defendant appeared to have been drinking alcohol, his speech was not slurred, he did not stagger when he walked, and he appeared to be coherent. A bartender at the bar Defendant visited prior to the shooting testified that Defendant carried on a conversation and that he did not exhibit any behavior to indicate he was too intoxicated to continue to be served. Detective Anderson attempted to interview Defendant at the police station following the shooting. He testified that he smelled alcohol on Defendant's person, but that Defendant gave appropriate answers to several of his questions. Defendant was able to understand and communicate with Detective Anderson. We conclude that Defendant was not so intoxicated that he was unable to act with premeditation.

In conclusion, the evidence was sufficient to support Defendant's conviction. Accordingly, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE